*1383 OPINION.
MillikeN :
We are met at the outset with two contentions of petitioners, the first of which is that after February, 1922, they disregarded the corporate entity of the Bureau and carried on its business as partners, and the second is that they had, previous to that date, guaranteed the debt of the Bureau to the Association. Counsel for the petitioners in his brief filed in these proceedings thus states the first point: “ The petitioners after the departure of Mr. Young in February, 1922, actually carried on the business of the Elwin Bureau as a partnership venture, merely using the corporate name for convenience.” In support of this statement, he refers us to the following testimony of the petitioner Ellison:
Q. After Mr. Young left, how did you treat the business of the Elwin Concert Bureau?
A. We took it over just as any other department of our partnership.
A careful reading of the testimony as a whole does not disclose that the business of the Bureau was operated after March, 1922, in any way different from the method in which it had been operated prior to that date. From its organization there had been no formal directors’ or stockholders’ meetings, except, perhaps, when the officers were elected. Yet, it is not contended that the Bureau was not a full *1384 fledged corporation from the date of its organization down to March, 1922. If during this early period the business of the Bureau was carried on as a partnership, which is not claimed, then there can be no claim that advances to it by the Association constituted a worthless debt, for the reason that the petitioners, if partners, were amply able to pay the debt so far as the record discloses. After that date the Bureau continued to make contracts and kept its accounts in its corporate name. Those who dealt with it treated it as a corporation. About one-half of its contracts were guaranteed by petitioners in their individual capacities. If they were operating as individuals and not as a corporation, it is obvious that there was no necessity for such individual guaranties. The only difference between the operation of the Bureau before and after March, 1922, that is disclosed by the record, is that prior to that date the Association advanced the money needed by the Bureau and subsequent to that date such money was advanced by petitioners. The mere fact that petitioners were the only stockholders and dealt informally with the affairs of the corporation is not exceptional in such closely held corporations, and in and of itself does not disclose an abandonment of the corporate entity. We find no merit in this contention.
It is true that each petitioner in his petition alleged that advances by the Association to the Bureau were made “ upon the express understanding and agreement that the pajmient of said advances was guaranteed ” by petitioners “ in their respective individual capacities.” These allegations were denied in the answers of respondent and no evidence was adduced to substantiate these allegations. It majr be said, in passing, that such an obligation was “ void ” under section 808, Oregon Latvs, vol. I, unless made in writing subscribed by petitioners or their lawfully authorized agents. The nearest approach to a showing of such prior guaranty is the testimony of the petitioner White, which is as follows:
Q. What agreement, if any, did you have with respect to the notes that were being carried as assets of Ellison-White Lyceum & Chautauqua Association?
The Witness. I want to get clear the notes you referred to.
By Mr. McCulloch:
Q. The notes receivable of the Ellison-White Lyceum & Chautauqua Association. What agreement did you have with Mr. Ellison with respect to charging them to your personal accounts?
A. We agreed mutually they would be charged to us and therefore paid by us personally.
Q. At the time this was done Avere these accounts collectible or were they knoAvn losses?
Mr. Meacham. That is objected to as calling for a conclusion of the witness.
The Member. I think Mr. Ellison has testified to practically all that Mr. White has testified. Ho stated he heard Mr: Ellison’s testimony and it was his best judgment that he stated truthfully the facts as he understood them.
*1385 Mr. McCulloch. I am not trying to go over the entire ground that Mr. Ellison covered, but I do want to specifically, and not by one blanket question, have Mr. White give his understanding of the situation.
By Mr. McCulloch:
Q. You heard Mr. Ellison’s testimony with respect to his beliefs that these notes were uncollectible at that time. Was that also your belief at the time?
A. Yes.
It is to be noted that the agreement to pay the indebtedness was made “ at the time ” the charge-off was made in March, 1922.
It thus appears that by the voluntary act of petitioners, they in March, 1922, assumed or attempted to assume (section 808, Oregon Laws) without any previous individual liability, the debt of the Bureau to the Association, and for the first time came into ownership of the notes representing that debt. At that very time this debt was worthless. It it therefore petitioners’ contention that they had the right to charge off a debt as worthless which was worthless when they acquired it.
The fact is that petitioners have mistaken the nature of their deduction. What in reality occurred was that petitioners in March, 1922, for the first time assumed or attempted to assume the debt due from the Bureau to the Association, and for the first time acquired or thought that they acquired the ownership of a worthless debt. They then became or thought they became liable to the Association for this debt and if they had kept their accounts on an accrual basis, it may be that they then incurred a deductible loss. Since their only books of account were their check stubs and memoranda showing their income and disbursements, they were on a cash receipts and disbursements basis. Being on a cash basis, petitioners could incur no deductible loss until they made payments to the Association on account of the debt of the Bureau and then only to the extent of the amounts so paid during the years 1922 and 1923, the years now before us. This is true, even if petitioners had by binding contract agreed to guarantee the debts of the Bureau when incurred. See Morris Sass, 12 B. T. A. 156, and Elmer A. Clark, 14 B. T. A. 65. Petitioners have not shown and do not claim that they have made any such payments during said years or at any other time. So that even if petitioners had claimed a deductible loss with respect to this transaction, which they have not, they would not be entitled to take such loss in the taxable year» Petitioners are not entitled to deduct the sum of $92,413.35 or any part thereof from their gross income for the year 1922 as a worthless debt or for any other reason.
Petitioners, having guaranteed the contract of the Beggar’s Opera Co., and having been compelled to pay to that company on their guaranty, in the year 1922, the sum of $1,405.05, are each entitled to deduct from their gross income for that year one-half of said amount.
*1386 Petitioners at the hearing amended their petitions and claimed as alternatives to the errors asserted in their original petitions that they should be allowed deductions as operating losses in the net amounts advanced by them to the Bureau in the years 1922 and 1923. The record discloses that petitioners advanced to the Bureau during the year 1922 and subsequent to March 15 of that year the sum of $22,693.9? and were repaid by the Bureau in the amount of $1,600, leaving a balance of $21,093.97, and that they advanced to the Bureau during the year 1923 the sum of $63,300 and received back $33,200, leaving a balance of $30,100, or a balance due them for both years in the amount of $51,193.97. Taking into consideration also the year 1924, which was the last year during which the Bureau was operating as a corporation, the total advances made amounted to $108,643.97, and the total amount of repayments amounted to $54,800, leaving a total still owing them of $53,843.97. It is apparent that petitioners have actually lost the above amount and that no part of such amount will ever be recouped.
The business of the Bureau prior to its incorporation had been petitioners’ individual business and this businesss in connection with their chautauqua and lyceum work had for years been their individual vocations. Petitioners assert that to have abandoned this line of business would have resulted in rendering of no avail all their previous experience and training; that under these circumstances it was good business policy to continue the work of the Bureau until such time as they could transfer their efforts to a larger and more efficient organization, and that the only alternative to this was a disastrous bankruptcy which would entail upon them a much larger loss if they came to the rescue, or the loss of their business prestige if they did not. They point out that by pursuing this course they eventually attained their goal. It is further asserted that no new business was contracted and no new artists or attractions engaged, except for the purpose of completing and filling our saleable courses and attractions, using as the nucleus the artists with whom contracts had already been made. Finally, it is contended that petitioners knew they were advancing their money to an insolvent and progressively losing enterprise, without hope of recovery of all that they advanced. Each year found them in deeper and deeper, with the final result above shown, a result which petitioners largely anticipated from the time they began to make the advancements.
The vital question presented is, Did these advancements constitute debts which were deductible only if ascertained to be worthless and charged off during the taxable year, or were they losses sustained during the taxable year which were incurred in trade or business? (Section 214 (a) (4), (7) of the Bevenue Act of 1921.) It is not *1387 claimed by petitioners in their pleadings, nor by their counsel in his brief, that these advancements constitute bad debts, and therefore we do not consider this character of deduction.
It is true that the Bureau was legally obligated to return the advances, but the fact remains that it did not and could not fulfill its obligations except to a limited extent. The term “ debt ” not only implies a legal obligation, but to a large extent also implies the expectancy on the part of the creditor to receive payment. See Jacob Grossman, 9 B. T. A. 643. In the instant proceedings, petitioners were well aware of the fact that although a part of their advancements might be returned, a large part thereof would never be recovered. They knew at the time they would lose a large part of every dollar advanced. They knew in March, 1922, that the Bureau owed over $92,000, plus other indebtedness of at least $37,000, and was practically without assets. They saw it continue burdened with this initial liability and without acquiring new assets of value. They knew that as they went along the indebtedness would increase. The indebtedness did increase. It is clear that petitioners were not loaning money to the Bureau in any hope of receiving any return thereon and with no expectation of getting all of it back. What they were attempting to do was to keep alive a business which, although -a separate entity, was vitally essential to the success of their personal vocations. Their individual success or failure was wrapt up in the corporation; their business reputations, their future business hopes and expectations could be maintained and realized only through the operation of the Bureau. They hoped in this way that they could in the end abandon the corporation with honor and use their business experience and good will in a new and profitable organization. These hopes they realized. In our opinion the advancements made under the circumstances above detailed, although made to a corporation, were in fact losses sustained. Each petitioner is entitled to take as a deduction for the years 1922 and 1923, as a loss incurred in business, one-half of the net amount advanced .by them to the Bureau in each of said years. Since this and the deduction for the loss on the Beggar’s Opera Co. contract will leave each petitioner taxable income for each year, it becomes unnecessary to consider the question of net losses for the year 1922.
Reviewed by the Board.

Judgment will be entered under Rule SO.