W. F. YOUNG, Inc. v. COMMISSIONER OF INTERNAL REVENUE.

COMMISSIONER OF INTERNAL REVENUE v. W. F. YOUNG, Inc.

Nos. 3641, 3642.

Circuit Court of Appeals, First Circuit.

May 23, 1941.

Edward J. Keelan, Jr., of Boston, Mass. (Hale & Dorr, of Boston, Mass., on the brief), for W. F. Young, Inc.

William L. Cary, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., on the brief), for Commissioner of Internal Revenue.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This case is before this court on a petition filed by the Commissioner of Internal Revenue and a cross-petition filed by W. F. Young, Inc., to review a decision of the Board of Tax Appeals. The questions have to do with deductions taken by the taxpayer in its income tax returns for the years 1934, 1935 and 1936, also affecting its excess profits tax for the latter year, for certain advances made by it to its wholly owned subsidiary company, the Wilbur F. Young Realty Company, and the validity of an alleged claim for refund of 1934 income taxes.

The taxpayer is W. F. Young, Inc., a Massachusetts corporation which manufactures and sells a patent medicine known as "Absorbine, Jr.". In 1932 it bought all of the stock of the Wilbur F. Young Realty Company for $210,000. The principal assets of this company consisted of improved real estate in Springfield, Massachusetts, all of which was mortgaged. Its stock was owned by members of the Young family who also owned most of the taxpayer's stock. The Realty Company was operating at a deficit. One reason given for the purchase was to enable the two corporations to file consolidated returns so that the deficits of the Realty Company would reduce the tax liability of the taxpayer. Only in the year 1933 was a consolidated return filed and this showed a net loss of the Realty Company of $125,797.48, which was used to offset the income of the taxpayer.[1]

After the purchase of the stock of the Realty Company, certain advances were made to it by the taxpayer to enable it to pay interest, taxes and other operating expenses, and to prevent foreclosure of mortgages, deficiency judgments, and bankruptcy of the Realty Company. In 1933 the taxpayer advanced the sum of $56,750 to the Realty Company and on December 31, 1933, the total amount due to the taxpayer from the Realty Company was $141,043.20. The taxpayer made an advance of $66,372.-32 in 1934 so that at the end of that year the total amount due the taxpayer was $207,415.52. The advances made by the taxpayer in 1935 and 1936 were $30,894.88 and $58,372.23, respectively. The amounts advanced in the years in question were treated as loans on the books of the taxpayer and as liabilities on the books of the Realty Company.

The officers of the taxpayer in making the advances during the taxable years believed that the amounts would never be repaid but contended that they were necessary to protect the credit and reputation of the taxpayer because the two corporations were associated by the public with the Young family. It was argued that the bankruptcy of the Realty Company, or the foreclosure of any of the mortgages on its real estate, would reflect adversely on the faith and confidence which the public had in the patent medicine product manufactured by the taxpayer.

The taxpayer deducted from its income taxes for the taxable years involved amounts equal to the advances made to the Realty Company in the respective years as uncollectible debts which are entitled to be deducted if determined to be worthless and charged off on the books of the taxpayer during the taxable year.[2] The taxpayer also deducted as a loss in 1934 its stock holdings in the Realty Company which had become worthless in that year.

The Commissioner disallowed the deductions and determined deficiencies in the income taxes for the years 1934, 1935 and 1936 in the respective amounts of $9,842.12, $4,655.21 and $12,364.80 as well as a deficiency of $785.82 in the excess profits tax for the year 1936. The Commissioner contended that the deduction of the stock as worthless could not be taken because there was no identifiable event which occurred during the year 1934 which fixed the worthlessness of the stock, and that no deductions for bad debts were allowable where there was no expectation of repayment at the time the advances were made.

---

[1] The Revenue Act of 1934 (48 Stat. 680, 26 U.S.C.A. Internal Revenue Acts, pages 659, 715) amended Section 141 so as to limit to railroad companies the privilege of filing consolidated returns.

[2] Section 23(k) of the Revenue Acts of 1934, supra, and 1936 (49 Stat. 1648, 26 U.S.C.A. Internal Revenue Acts, pages 659, 673, 813, 828) provides:

"§ 23. *Deductions from Gross Income*

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(k) *Bad Debts*. Debts ascertained to be worthless and charged off within the taxable year \* \* \*; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

163

Upon the petition of the taxpayer for review of this and other adjustments made by the Commissioner, the Board of Tax Appeals found that the stock of the Realty Company owned by the taxpayer became worthless in 1934. The Commissioner has not appealed from this decision and the validity of the deduction as a loss in 1934 because of the worthlessness of the stock is not before us.

The Board further held that the fact that there was no expectation of repayment at the time the advances were made did not prevent the taxpayer from deducting these advances as bad debts or as losses.[3] The Board decided that on a correct redetermination of the taxes for the years here involved there was a deficiency for the year 1935 of $520.86; that in the year 1936 there was no deficiency in excess profits tax and that there was an overpayment of $965.76 in income taxes; and that although there was overpayment of income taxes for the year 1934, the taxpayer was barred from obtaining a refund because of failure to file a proper claim for refund within the period allowed by law.

The petition of the Commissioner asks us to reverse the decision of the Board of Tax Appeals allowing the deduction of the advances made to the Realty Company on his original ground that such deductions are not allowable when there was no expectation of repayment at the time when the advances were made. However, he contends that if the Board were right in its decision, its holding that the taxpayer did not file a proper claim for refund in 1934 should also be sustained. Conversely, the cross-petition of the taxpayer asks us to affirm the decision of the Board allowing the deduction of the advances made but to reverse its holding that the taxpayer is barred from recovering the overpayment made in 1934.

We do not agree with the decision of the Board of Tax Appeals. The taxpayer contends that the advances made by it to the Realty Company during the taxable years here involved were proper deductions from its taxable income for those years. It asserts that the advances were deductible losses either as debts ascertained to be worthless and charged off within the taxable year, as losses sustained during the taxable year and not compensated for by insurance or otherwise, or as ordinary and necessary expenses of the taxpayer's business. We agree that the advances made represent losses to the taxpayer; but whether they are deductible losses depends entirely on the interpretation of the intention of Congress. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Sabath v. Commissioner, 7 Cir., 1938, 100 F.2d 569, 574; Brown v. United States, 3 Cir., 1938, 95 F.2d 487. We do not believe the deductions were allowable.

In its income tax returns for the taxable years here involved, the taxpayer deducted these advances made only as debts ascertained to be worthless and charged off within the taxable years. In the explanations of adjustments made by the Commissioner and shown as part of the taxpayer's Exhibit A, the Commissioner stated that the advances were not deductible "under either the bad debt or loss provisions" of the various revenue acts. The taxpayer's petition for review by the Board relies solely on the provision for the deduction of debts ascertained to be worthless and charged off within the taxable year. The Board, however, considered itself at liberty to pass upon the question whether the deductions could be allowed as losses to the taxpayer. Whether the advances were permitted to be deducted as bad debts or as losses is uncertain, as the determination was made in the alternative and no clear decision was made by the Board.

The Commissioner contends that there can be no deduction for a debt ascertained to be worthless and charged off within the taxable year when the debt was worthless when contracted and when the creditor lent the money with no hope or expectation of repayment. We agree with the Commissioner.

[3] In allowing the deductions as losses, the Board apparently was relying on Sections 23(a) and 23(f) of the Revenue Acts of 1934 and 1936, supra, 26 U.S.C.A. Int.Rev.Acts, pages 671, 672, and 827, 828, which provide:

"§ 23. *Deductions from Gross Income*

"In computing net income there shall be allowed as deductions:

"(a) *Expenses.* All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.

* * * * * *

"(f) *Losses by Corporations.* In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

The Board found that "the officers of the petitioner, in making the advances during the taxable years, believed that the amounts would never be repaid"; and Mr. Caswell, treasurer of the taxpayer and vice-president of the Realty Company, testified that "It was our firm conviction that there was no hope or no likelihood of collection of that $207,000 [$207,415.52] in 1934 and that we would never collect. With that knowledge or conviction that we never could collect the $207,000 we made an advance of $66,372.32 in that year and wrote it off in the same year and claimed a deduction. Under the same circumstances. we advanced $30,000 [$30,894.88] in 1935 and $58,000 [$58,372.23] in 1936 and claimed those deductions." There could scarcely be a stronger statement of the worthlessness of these alleged debts at the moment that the advances were made.

The taxpayer, even before it made the advances, never expected to be repaid; even before it entered each transaction upon its books as a loan, it had mentally wiped it out as uncollectible. For reasons which seemed good to it, the taxpayer thought it worth while to expend this part of its income in this way. But it never expected to see this money return; it intended to eliminate the so-called loan from its books from the moment it was entered. In all the cases where alleged loans have been questioned as to their admissibility as bad debt deductions, the primary emphasis has been upon whether or not there was an expectation of repayment. Such advances, made with the belief that they would not be repaid, are in the nature of gifts, and are not deductible as bad debts. American Cigar Co. v. Commissioner, 2 Cir., 1933, 66 F.2d 425, 427, certiorari denied, 1933, 290 U.S. 699, 54 S.Ct. 209, 78 L.Ed. 601; C. B. Hayes v. Commissioner of Internal Revenue, 1929, 17 B.T.A. 86; see Shiman v. Commissioner, 2 Cir., 1932, 60 F.2d 65, 66; cf. Kinkead v. Commissioner, 3 Cir., 1934, 71 F.2d 522; Redfield v. Eaton, D. C.Conn.1931, 53 F.2d 693, 695; Robert H. Montgomery v. Commissioner of Internal Revenue, 1938, 37 B.T.A. 232, 242; Roy Nichols v. Commissioner of Internal Revenue, 1929, 17 B.T.A. 580; C. H. White v. Commissioner of Internal Revenue, 1929, 15 B.T.A. 1375; Max Baumann et al., Executors, v. Commissioner of Internal Revenue, 1927, 8 B.T.A. 107; see Paul & Mertens, The Law of Federal Income Taxation (1934) §§ 28.04, 28.05, 28.17; Annotation, 99 A.L.R. 566, 569.

It is urged upon us that there is a legal obligation to repay the advances which the taxpayer could enforce at law. The Board itself answered that argument in the case of C. B. Hayes v. Commissioner of Internal Revenue, supra, where it said: "If there was no intention to enforce the note, or if there was no reasonable expectation when given that it would be paid, the transaction was more in the nature of a gift to the son-in-law than a debt. It is true that a note was given which was legally enforcible. But a gift may not be claimed as a deduction for tax purposes by the device of taking a note for the amount of the gift. And this we deem so, even though the note may be legally enforcible, if there is no intent to enforce the note or reason to believe when taken that it cannot be collected."

We are in complete agreement with this position. It is true that intra-family advances are presumed to be gifts unless it is shown otherwise; but where an expectation of repayment is found, and this expectation is not fulfilled, a bad debt deduction will be allowed. Redfield v. Eaton, supra. Compare Charles H. Sooy v. Commissioner of Internal Revenue, 1928, 10 B.T.A. 493, affirmed 9 Cir., 1930, 40 F.2d 634, with Appeal of Richard M. Page, 1925, 2 B.T.A. 1316. See Paul & Mertens, op. cit., at § 28.15. In a sense, the advances here made were intra-family. The Young family owned most of the stock of the W. F. Young Company, the taxpayer, which in turn owned all the stock of the W. F. Young Realty Company. The advances were claimed to have been made to protect the credit of W. F. Young Company because its name was similar to that of the Realty Company and also for reasons of "pride and sentiment". The transactions were all bound up with the reputation and good name of the Young family which had been making advances to the Realty Company before its stock was purchased by the family corporation. The taxpayer felt that the expenditure of this money was worth while for various reasons supposedly beneficial to itself and the Young family; but it never expected to get it back. It knew the money to be gone without return, to be a loss. Cf. Sidney Ross Co. v. Commissioner of Internal Revenue, 1932, 26 B.T.A. 499. It appears to us that in such circum-

stances the cases holding intra-family alleged loans to be in the nature of gifts are applicable. It seems fairly well settled that transactions such as these have not been considered deductible bad debts.

██ It has also been suggested that a deduction should not be denied because the creditor was unwise in making the loan or in relying for repayment upon a borrower who is in an obviously bad financial condition. See Shiman v. Commissioner, supra, 60 F.2d at page 67; Redfield v. Eaton, supra, 53 F.2d at page 694; Holmes Ives v. Commissioner of Internal Revenue, 1926, 5 B.T.A. 934. However, that is not the situation here. The taxpayer did not unwisely rely for repayment on the credit or financial integrity of the Realty Company when it made these advances. It relied on nothing for repayment, for it knew it would not be repaid. With the wisdom or unwisdom of the transaction we have nothing to do. We do not say this was a debt unwisely made as the cases above intimated; we say it was not truly a debt which was expected to be repaid. We think the advances made were in the nature of gifts and not deductible as debts ascertained to be worthless and charged off within the taxable year. American Cigar Co. v. Commissioner, supra.

██ We are confirmed in our opinion by an analysis of the Congressional scheme of income tax deductions. In enacting provisions for income tax deductions, Congress is only interested in determining what part of a company's gross income it believes should be treated as net income for the purposes of income taxation. McCoach v. Insurance Co. of North America, 1917, 244 U.S. 585, 37 S.Ct. 709, 61 L.Ed. 1333; Massachusetts Protective Association v. United States, 1 Cir., 1940, 114 F.2d 304, 312; Lloyd v. Commissioner, 7 Cir., 1932, 55 F.2d 842. To determine this net income, Congress has provided for deductions for ordinary and necessary business expenses, interest paid on indebtedness, taxes paid, certain kinds of losses, depreciation, depletion, and others not here relevant. It is worthy of note that the basis of these deductions is involuntary payment, with the possible exception of a bad debt deduction. Necessary business expenses, interest, taxes, depreciation, depletion and most losses are not voluntary expenditures or decreases in value. In one sense a bad debt is not a voluntary diminution of income, for the debt was contracted with the expectation that it would be repaid.

██ However, it has been several times held that a debt which is worthless when acquired cannot be charged off as a bad debt by the taxpayer. Kinkhead v. Commissioner, supra; C. H. White v. Commissioner of Internal Revenue, supra. It may be a loss, but if so it must fulfill the requirements for a loss deduction. We do not believe that Congress, in addition to providing for the deduction of certain losses, intended to allow the deduction of other losses as bad debts when the taxpayer knew that the money allegedly lent would never be repaid and when the amount was known to be a loss at the moment it was paid over. The words "debts ascertained to be worthless and charged off within the taxable year" seem inescapably to mean debts which were considered good when made but subsequently ascertained to be worthless. So-called debts which were never expected to be repaid must be deducted as losses or not at all. Spring City Foundry Co. v. Commissioner, 1934, 292 U.S. 182, 189, 54 S.Ct. 644, 78 L.Ed. 1200; Porter v. United States, 9 Cir., 1928, 27 F.2d 882.

The cases of Shiman v. Commissioner, supra, and Daniel Gimbel v. Commissioner of Internal Revenue, 1937, 36 B.T.A. 539, relied on by the taxpayer and the Board are distinguishable. In both of those cases the payments, deduction of which was allowed as bad debts, were made involuntarily in fulfillment of guarantees previously entered into. In the Shiman case it was expressly found that when the guarantee was given, the person whose account was guaranteed was solvent; and in the Gimbel case there is no finding that the company was insolvent when the notes or guarantees were given. It is true that no debt arose between the guarantor and the party guaranteed until payment was made on the guarantee at which time the party guaranteed was insolvent and the debt worthless, but the fact that it was worthless at the time the payment creating the debt was made could not defeat the right of the taxpayer to the deduction since the binding obligation to pay had arisen long since when the party guaranteed was still solvent. Hamlen v. Welch, 1 Cir., 1940, 116 F.2d 413, 418; Shiman v. Commissioner, supra. Such is not the situation here since the taxpayer was under no legal obligation

whatsoever to make these payments. Allusion was made in the taxpayer's Exhibit 4 to "a reputed verbal guarantee by the deceased president of the taxpayer (and former owner of the real property) to certain of these mortgage holders [of Realty Company property]". No evidence was given of such guarantee nor were any findings regarding it made by the Board, and the taxpayer seems not to have relied upon it at any point in the litigation. For these reasons we do not consider these cases to be in point.

▌ Nor do we believe that these advances can be deducted either as ordinary and necessary business expenses or as losses not compensated for by insurance or otherwise. The taxpayer was under no obligation to make these advances. They were purely voluntary payments which were to be applied to pay the debts of another corporate entity engaged in a completely different line of business. It is well established that voluntary payments of the obligations of another are neither ordinary and necessary business expenses nor losses not compensated for by insurance within the meaning of the revenue acts. Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Sam P. Wallingford Grain Corp. v. Commissioner, 10 Cir., 1934, 74 F.2d 453; White v. Commissioner, 9 Cir., 1932, 61 F.2d 726; Robinson v. Commissioner; 8 Cir., 1931, 53 F.2d 810, 79 A.L.R. 975; National Piano Mfg. Co. v. Burnet, 1931, 60 App.D.C. 160, 50 F.2d 310.

The taxpayer insists that these payments were necessary to sustain the credit and reputation of the W. F. Young Company, Inc., which it claimed would be injured by the foreclosing of the mortgages on or the bankruptcy of the Realty Company of the same family name. Other reasons, as pointed out above, were "pride and sentiment". Even if the credit and reputation of the taxpayer would have been improved by these payments and even though they would in any way benefit the taxpayer, voluntary payments are not deductible as ordinary and necessary business expenses or losses. Commissioner v. The Hub, 4 Cir., 1934, 68 F.2d 349; Sam P. Wallingford Grain Corp. v. Commissioner, supra; White v. Commissioner, supra; Foye Lumber & Tie Co. v. Commissioner of Internal Revenue, 1935, 33 B.T.A. 271; cf. Appeal of Forty-Four Cigar Co., 1925, 2 B.T.A. 1156.

▌ The losses intended to be deductible are, in general, physical losses by fire, flood, or other like causes which are not covered by insurance. Porter v. United States, supra. And expenses to be deductible must have a reasonable relation to the business. Crowley v. Commissioner, 6 Cir., 1937, 89 F.2d 715. Even assuming that the advances were necessary to the taxpayer's business, it was certainly not an ordinary expense since the taxpayer was not engaged in the real estate business. Cf. United States v. Donaldson Realty Co., 8 Cir., 1939, 106 F.2d 509, 515, 517. Nor do we believe that the failure of the Realty Company operating solely in Springfield, Massachusetts, would have any real effect upon the commercial credit and good will of the manufacturers of "Absorbine, Jr.".

▌ In its opinion, the Board found that one reason justifying the advances was the belief of the officers of the taxpayer that they would minimize the taxpayer's losses by holding on, and the belief that a market would develop within a reasonable time. This was not set out in the findings of fact, and we do not believe it has any basis in the evidence. The only testimony along that line was that of Mr. Caswell stating that when the taxpayer bought the Realty Company in 1932, the prospects looked brighter. There was no evidence that the advances were made because of the hope of later prosperity.

The taxpayer and the Board relied heavily on C. H. White v. Commissioner of Internal Revenue, supra. It should be noted that the Commissioner filed his nonacquiescence in that opinion. IX-1 C. B. 77 (1930). Even if the Board in that case properly allowed the taxpayer to deduct as losses the advances made to the musical corporation which they owned, this case is distinguishable. In the White case, the taxpayers had guaranteed the performance of the corporation's contracts. Furthermore, the taxpayers individually and the corporation to which they advanced money were engaged in the same business, and the individuals were forced to look after the finances of the corporation or have their professional future ruined. Such is hardly the case here. We do not consider the voluntary payments here made, no matter how beneficial to the taxpayer and its stockholders, to be deductible as ordinary and necessary business expenses or as losses not compensated for by insurance.

The taxpayer also urges that moneys advanced before 1934 were true debts which could have been charged off as worthless in 1934 and that since they amounted to more than the $66,372.32 advanced in 1934 and charged off, at least that amount should be deductible. We do not agree. What the taxpayer ascertained to be worthless and charged off in 1934 was the advance of $66,372.32 made in that year. It made no attempt to charge off any other sums owing nor did it ascertain any other amounts to be worthless, except $75,000 on unsecured notes which was charged off and the deduction apparently allowed. The fact that the taxpayer charged off only $75,000 and this $66,372.32 in that year shows that it had the problem in mind and did not intend to charge off any other items.

As we read the stipulation of the parties filed October 31, 1940, it becomes unnecessary to pass upon the validity of the alleged claim for refund of 1934 taxes in view of our holding that the Board was in error in allowing the deduction of $66,372.32 for 1934. In any event, we agree with the conclusion of the Board, for the reasons stated in its decision, that the taxpayer had failed to file a proper claim for refund within the period allowed by law.

The decision of the Board of Tax Appeals is reversed and the case remanded for a redetermination of the deficiencies in accordance with this opinion.